# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-11473-PBS

Bankruptcy Case Nos.
04-13855 and 04-13857-JNF
(Jointly Administered)

**FORT HILL SQUARE ASSOCIATES and
FORT HILL SQUARE PHASE 2 ASSOCIATES
Debtors.**

IP COMPANY, L.L.C,
Appellant,

v.

FORT HILL SQUARE ASSOCIATES,
FORT HILL SQUARE PHASE 2 ASSOCIATES, and
OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

Appellees

## BRIEF OF APPELLEES FORT HILL SQUARE ASSOCIATES AND FORT HILL SQUARE PHASE 2 ASSOCIATES

Submitted by:

Charles R. Bennett, Jr., BBO #037380
Harold B. Murphy, BBO #362610
Kathleen E. Cross, BBO #556934
Christopher M. Morrison, BBO #651335

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA 02108
Tel: (617) 423-0400
Fax: (617) 556-8985

Date: August 6, 2004

| | | |
|---|---|---|
| 3. | IP Company Misunderstands Section 552(b) As It Applies To Adequate Protection | 21 |
| 4. | Valuing Secured Creditor's Claim At Petition Date Is Proper For Determining Adequate Protection | 27 |
| 5. | IP Company Relies Heavily On Confirmation Cases That Are Irrelevant To A Determination Of Adequate Protection | 32 |
| 6. | IP Company's Cash Collateral Continues To Be Adequately Protected, Thereby Allowing The Debtors To Pay All Authorized Administrative Expenses | 35 |
| 7. | IP Company's Argument That The Collateral Is Declining Is A Red Herring | 37 |

CONCLUSION ................................................................................................. 39

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE NOS.**

*Anderson v. City of Bessemer City,*
  470 U.S. 564 (1985) ................................................................................................ 2

*Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,*
  284 B.R. 668 (D. Mass. 2000) ................................................ 2, 14, 24, 27, 34, 37, 38, 39

*Bramham v. Nevada First Thrift (In re Bramham),*
  38 B.R. 459 (Bankr. D. Nev.1984) ....................................................................... 20

*Butner v. United States,*
  440 U.S. 48 (1979) ............................................................................................ 22

*Commonwealth of Massachusetts v. Dartmouth Nursing Home, Inc.*
*(In re Dartmouth Nursing Home, Inc.),*
  1985 WL 17642 (D.Mass. Sept. 25, 1985) ........................................................... 18

*Confederation Life Ins. Co. v. Beau Rivage Ltd.,*
  126 B.R. 632 (N.D.Ga.1991) .............................................................................. 34

*EEOC v. St. Francis Xavier Parochial Sch.,*
  117 F.3d 621 (D.C. Cir. 1997) ............................................................................ 16

*Financial Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship*
*(In re T-H New Orleans Ltd. P'ship),*
  116 F.3d 790 (5th Cir. 1997) .............................................................................. 32

*First Agric. Bank v. Jug End in the Berkshires, Inc. (In re Jug End in*
*the Berkshires, Inc.),*
  46 B.R. 892 (Bankr. D. Mass. 1985) .................................................................... 19

*Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.),*
  218 B.R. 643 (1st Cir. B.A.P. 1998) ..................................................................... 1

*Liberty Nat. Enter. v. Ambanc La Mesa Ltd. P'ship*
*(In re Ambanc La Mesa Ltd. P'ship),*
  115 F.3d 650 (9th Cir. 1997), cert. denied, 522 U.S. 1110 (1998) ......................... 24

*Lyons v. Federal Sav. Bank (In re Lyons),*
  193 B.R. 637 (Bankr. D. Mass. 1996) .................................................................. 23

*New Hampshire Right to Life Political Action Committee v. Gardner,*
  99 F.3d 8 (1st Cir. 1996) ..................................................................................... 1

**CASES**  **PAGE NOS.**

*Pagano v. Cooper (In re Cooper),*
   22 B.R. 718 (Bankr. E.D. Penn. 1982) ................................................................ 18

*Patriot Portfolio, LLC v. Weinstein (In re Weinstein),*
   164 F.3d 677 (1st Cir. 1999) .................................................................................. 2

*United Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd.,*
   484 U.S. 365 (1987) ...................................................................................... 20, 24

*Valley Forge Christian Coll. v. Americans United for
Separation of Church and State,*
   454 U.S. 464 (1982) ............................................................................................ 16

*Warth v. Seldin,*
   422 U.S. 490 (1975) .............................................................................................. 1

*Winthrop Old Farm Nurseries v. New Bedford Inst. For Savings
(In re Winthrop Old Farm Nurseries),*
   50 F.2d 72 (1st Cir. 1995) ........................................................................ 2, 33, 39

*Zink v. Vanmiddlesworth,*
   300 B.R. 394 (N.D.N.Y. 2003) ........................................................................... 37

*In re Addison Props. Ltd. P'ship,*
   185 B.R. 766 (Bankr. N.D. Ill. 1995) .................... 13-14, 17, 23, 26, 28-31, 33, 36

*In re Anthem Communities/RBG, LLC,*
   267 B.R. 867 (Bankr. D.Colo. 2001) .................................................................. 37

*In re Arden Properties, Inc.,*
   248 B.R. 164, 168 (Bankr. D. Ariz. 2000) .......................................................... 24

*In re Barkley 3A Investors, Ltd.,*
   175 B.R. 755 (Bankr. D. Kan. 1994) .................................................................. 23

*In re Barkley-Cupit Enterprises,*
   13 B.R. 86 (Bankr. N.D. Ga. 1981) .................................................................... 28

| **CASES** | **PAGE NOS.** |
|---|---|
| *In re Bennett Funding Group, Inc.*, 255 B.R. 616 (N.D.N.Y. 2000) | 19 |
| *In re Cafeteria Operators, L.P.*, 299 B.R. 400 (Bankr. N.D. Texas 2003) | 25, 26, 27 |
| *In re Cason*, 190 B.R. 917 (Bankr. N.D. Ala. 1995) | 27, 28, 29, 34 |
| *In re Delta Resources Inc.*, 54 F.3d 722 (11th Cir. 1995) | 28 |
| *In re Duval Manor Assocs.*, 191 B.R. 622 (Bankr. E.D. Pa. 1996) | 31 |
| *In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D. N.H. 1993) | 26, 29 |
| *In re Family Investments, Inc.*, 8 B.R. 572 (Bankr. W.D. Ky. 1981) | 20 |
| *In re Farmer*, 257 B.R. 556 (Bankr. D. Montana 2000) | 28, 31 |
| *In re First South Savings Assoc.*, 820 F.2d 700 (5th Cir.1987) | 20 |
| *In re Flagler-at-First Assocs., Ltd.*, 114 B.R. 297 (Bankr. S.D. Fla. 1990) | 25, 34 |
| *In re Homestead Part., Ltd.*, 200 B.R. 274 (Bankr. N.D. Ga. 1996) | 31 |
| *In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992) | 24, 26, 27 |
| *In re Johnson*, 165 B.R. 524 (S.D. Ga. 1994) | 28 |
| *In re Karl A. Neise, Inc.*, 16 B.R. 600 (Bankr. S.D. Fla. 1981) | 18 |
| *In re Keystone Camera Prods. Corp.*, 126 B.R. 177 (Bankr. D. N.J. 1991) | 19 |

| **CASES** | **PAGE NOS.** |
|---|---|
| *In re Kilian,* 169 B.R. 503 (Bankr. D.R.I. 1994) | 34 |
| *In re Lackow Brothers, Inc.,* 10 B.R. 717 (Bankr. S.D. Fla. 1981) | 20 |
| *In re Landing Associates, Ltd.,* 122 B.R. 288 (Bankr. W.D. Tex. 1990) | 28 |
| *In re LaRoche,* 969 F.2d 1299 (1st Cir. 1992) | 39 |
| *In re Markos Gurnee P'ship,* 252 B.R. 712 (Bankr. N.D. Ill. 1997) | 20, 26, 28, 31 |
| *In re National/Northway Ltd. Part.,* 279 B.R. 17 (Bankr. D. Mass. 2002) | 22 |
| *In re Oaks Partners, Ltd.,* 135 B.R. 440 (Bankr. N.D. Ga. 1991) | 34 |
| *In re O'Connor,* 808 F.2d 1393 (10th Cir. 1987) | 2 |
| *In re Prichard Plaza Assocs. Ltd.P'ship,* 84 B.R. 289 (Bankr. D. Mass. 1988) | 24 |
| *In re Q-C Circuits Corp.,* 231 B.R. 506 (E.D.N.Y. 1999) | 2 |
| *In re Reddington/Sunarrow Ltd. P'ship,* 119 B.R. 809 (Bankr.D.N.M.1990) | 34 |
| *In re Snowshoe Co., Inc.,* 789 F.2d 1085 (4th Cir.1986) | 2 |
| *In re Sonnax Indus., Inc.,* 907 F.2d 1280 (2d Cir.1990) | 37 |
| *In re Stein,* 19 B.R. 458 (Bankr. E.D. Pa. 1982)) | 29 |
| *In re Timbers of Inwood Forest Assoc. Ltd.,* 793 F.2d 1380 (5th Cir. 1986) | 24 |

| **CASES** | **PAGE NOS.** |
|---|---|

*In re Worldcom, Inc.,*
   304 B.R. 611 (Bankr. S.D.N.Y. 2004) .................................................................. 19

*In re Wrecclesham Grange,*
   221 B.R. 978 (Bankr. D. Mont. 2000) ......................................................... 24, 31, 37


| **STATUTES** | **PAGE NOS.** |
|---|---|

11 U.S.C. §361 .................................................................................... 11, 12, 14, 18-19, 33, 35

11 U.S.C. §363 .................................................................................... 11, 12, 14, 18-19, 29, 33, 35

11 U.S.C. §506 .................................................................................... 7, 14, 30, 31, 32, 33, 35

11 U.S.C. §552 .................................................. 12-13, 18, 21, 22-24, 26-27, 29, 31-32, 34-35


| **RULES** | **PAGE NOS.** |
|---|---|

Fed.Bankr.R. 8010 ........................................................................................................ 12

Fed.Bankr.R. 8013 .......................................................................................................... 2


| **SECONDARY SOURCES** | **PAGE NOS.** |
|---|---|

124 Cong. Rec.H11095 .................................................................................................. 33

*S. Rep. No. 95-989,* 95th Cong., 2d Sess. 68 (1978) U.S. Code
   Cong. & Admin. News 1978, pp. 5787, 5854 ...................................................... 14, 33

Sally S. Neeley et al., *Postpetition Rents and the Claims of Undersecured
Creditors With Assignment of Rents in Chapter 11 Cases,*
SD24 ALI-ABI 363, 373 n.10 (1998) ............................................................................. 22

Kathryn R. Heidt, *The Effect of the 1994 Amendments on Commercial
Secured Lenders,* 69 AM. BANKR. L.J. 395, 399-400 (Summer 1995) ........................ 22

David F. Heroy, Adam R. Schaeffer, *Valuation in Bankruptcy,* 862 PLI/Comm.
153, 164 (Practicing Law Institute, Commercial Law and Practice Course
Handbook Series) .......................................................................................................... 29

## STATEMENT OF ISSUE PRESENTED

Whether Judge Feeney correctly determined that IP Company was adequately protected for the Debtors'[1] use of cash collateral to pay fees of professionals retained by the bankruptcy estates for a period of thirteen weeks where the Debtors' uncontested budget for that period projected nearly a $4 million increase over the cash collateral existing at the Petition Date.

## STATEMENT OF APPELLATE JURISDICTION

As a threshold matter, this Court must determine that jurisdiction appropriately lies before it may entertain the merits of this appeal. *E.g., Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. B.A.P 1998) ("this panel is duty bound to determine its jurisdiction over this appeal before proceeding to the merits") (collecting cases). Because the Cash Collateral Order is not final, the appellants did not seek leave to file an interlocutory appeal, and no grounds exist for permitting an interlocutory appeal in this case, this Court lacks jurisdiction of the subject matter of this appeal.[2]

## STANDARD OF APPELLATE REVIEW

Contrary to IP Company's contention that the "issues presented in this appeal are limited to issues of law," (Appellant's Initial Brief at p. 4), determinations of adequate protection are inherently factual and are therefore reviewed under the clearly erroneous

---

[1] The Debtors are Fort Hill Square Associates ("FHS") and Fort Hill Square Phase 2 Associates ("FHS2").

[2] The Debtors incorporate by reference herein their Motion to Dismiss Appeal and Memorandum in Support Thereof (Docket Nos. 4 & 5, filed July 13, 2004). In addition, as is set forth more fully *infra*, IP Company is without standing in this appeal. Standing, like subject matter jurisdiction, is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *New Hampshire Right to Life Political Action Committee v. Gardner*, 99 F.3d 8, 12 (1st Cir. 1996).

1

standard. *E.g., In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987) ("Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact."); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir.1986); *see also* Fed.Bankr.R. 8013; *Winthrop Old Farm Nurseries v. New Bedford Inst. For Savings (In re Winthrop Old Farm Nurseries)*, 50 F.3d 72, 73 (1st Cir. 1995) (factual matters reviewed for clear error); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 677 (D. Mass. 2000). A finding of fact is clearly erroneous only when, after reviewing the evidence, the court "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).

In like fashion, permission to use cash collateral is a subject that is within the discretion of the bankruptcy judge. *See, e.g., In re Q-C Circuits Corp.*, 231 B.R. 506 (E.D.N.Y. 1999) ("it is clear that the bankruptcy court had the power and discretion to allow the Debtor to use cash collateral."). Such discretionary matters are reviewed only for abuse. *See Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 687 (1st Cir. 1999); *Beal Bank*, 248 B.R. at 677. To the extent IP Company's appeal raises any pure issues of law appropriate for review, such issues are subject to *de novo* examination. *In re Winthrop Old Farm Nurseries*, 50 F.3d at 73.

## STATEMENT OF THE CASE

On May 7, 2004 (the "Petition Date"), the Debtors each filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Massachusetts. As of the Petition Date, the Debtors were not in default on their mortgage debt to IP Company, L.L.C. ("IP

Company"). (Appendix of Appellees Fort Hill Square Associates and Fort Hill Phase 2 Associates ("Debtors' App."), Tab 4, Memorandum of Law In Support of Motion for Authorization of (1) the Interim and Permanent Use of Cash Collateral, (2) the Granting of Replacement Liens, (3) Entry of a Scheduling Order Regarding Continued Use of Cash Collateral, and (4) Additional Relief, at 9 ("Cash Collateral Memo")). The Debtors' purpose in seeking reorganization is to refinance their notes with a new lender or, in the alternative, to restructure their debt with IP Company with the aim of satisfying all of their indebtedness, secured and unsecured.[3] ((Appendix of IP Company, L.L.C. ("IP App."), Tab A, Motion for Authorization of (1) the Interim and Permanent Use of Cash Collateral, (2) the Granting of Replacement Liens, (3) Entry of Scheduling Order Regarding the Use of Cash Collateral and (4) Additional Relief ("Cash Collateral Motion"), at 7).

### A. THE CASH COLLATERAL MOTION.

Cognizant that maintaining International Place as a going concern at this highly desirable downtown address would be essential to a reorganization that would benefit all interested parties, the Debtors, on the Petition Date, filed the Cash Collateral Motion. (IP App., Tab A, Cash Collateral Motion). In substance, the Cash Collateral Motion presented 13-week budgets (one for each Debtor, collectively, the "Budget")) which

---

[3] IP Company immediately filed a motion to dismiss the bankruptcy proceeding filed by the Debtors, claiming that the filings were somehow made in bad faith. Judge Feeney denied the motion, noting that "IP's arguments are flawed both factually and legally." (Debtors' App., Tab 7, Memorandum on Motion To Dismiss Chapter 11 Cases As "Bad Faith Filings," ("Motion To Dismiss Memo") at 2). Judge Feeney expressly determined, "[t]he obvious purpose of the Debtors' Chapter 11 cases is the proposal of a plan of reorganization to obtain relief from debt by taking advantage of provisions of bankruptcy laws affording relief to entities in financial trouble. IP's attempt to obtain dismissal and deny the Debtors even the opportunity to propose a plan to restructure and repay its secured and unsecured debt is contrary to the goal and purposes of Chapter 11." *(Id.* at 5).

3

would govern the expenditure of any cash in which IP Company claimed a continuing security interest (the "Cash Collateral")[4] from the date of filing through August 6, 2004 (the "Budget Period"),[5] at first on an emergency basis, and then through the expiration of the Budget Period. (*Id.*).

As of the Petition Date, the Budget demonstrates that the Debtors had cash on hand of $19,713,032.00, attributed to two sources: cash in the bank for One and Two International Place (approximately $7 million), and an escrow account associated with tenant improvements to One International Place (approximately $12.5 million). (IP App., Tab F, Objection of IP Company, L.L.C. to the Entry of a Final Order Authorizing the Debtors to Use Cash Collateral ("IP Objection"), at 8). At the end of the Budget Period, the Budget projects cash collateral to amount to $23,290,576 – a net gain of close to four million dollars. (IP App., Tab A, Cash Collateral Motion, at Exhibits A & B). With the exception of budget categories for Estate Professional Fees[6] and US Trustee Fees, the remainder of the expenditures are standard capital and operating expenses that would form the basis of any office building's operational budget. (*Id.*) In fact, these categories and projected revenue and expense for the Budget Period were derived directly from budgets provided to the Debtors' lender, Teachers Insurance and Annuity Association of America ("TIAA") prior to the transfer of Debtors' loans to IP Company. (Debtors'

---

[4] The Debtors reserved the right to challenge the extent, priority and validity of any lien or claim asserted by IP Company.

[5] On June 24, 2004, the Bankruptcy Court entered a Stipulated Order Between Debtors and IP Company LLC according to which the Debtors are authorized to use cash collateral through August 18, 2004. A hearing has been set for August 18, 2004 at 10 a.m. to consider the Debtors' continued use of cash collateral after that date.

[6] These monies will be used, upon court authorization, to pay the fees of counsel to the Debtors, counsel to the Official Committee of Unsecured Creditors, and any consultants either requires to assist in the administration of the estate.

App., Tab 5, Affidavit of Stephen P. Houle, at 2). An Interim Order issued on May 10, by which Judge Feeney allowed use of cash collateral per the first 18 days of the Budget. (IP App., Tab E, Interim Order Regarding Debtors' Cash Collateral Motion, at 3).

### B.   IP COMPANY'S NARROW OBJECTION TO USE OF CASH COLLATERAL.

By the conclusion of oral argument before Judge Feeney on the Cash Collateral Motion on May 28, 2004 ("May 28 Hearing"), IP Company narrowed its objections such that very little in the Budget remained contested. (IP App., Tab J, Amended and Corrected Order Granting Final Approval of Use of Cash Collateral and Granting of Adequate Protection ("Cash Collateral Order"), at 2). In the first instance, IP Company did not contest the Budget *per se*, i.e., the accuracy of the Debtors' projected revenues over the Budget Period or the amount of Cash Collateral that would remain if the Budget were allowed to operate as proffered.[7] (*Id.* (Judge Feeney found that "IP has not challenged the Debtors' Budgets, except for several categories, discussed below")). Neither did it object to ordinary-course expenses, as it repeatedly stated in its pleadings: "IP Company has no objection to the use of its cash collateral for ordinary and necessary operating expenses for the purposes of maintaining and preserving the International Place, subject to the terms and conditions outlined herein . . ." (IP App., Tab F, IP Objection, at 4). IP Company's counsel affirmed the limited scope of his client's opposition when he argued to the Court during the May 28 Hearing, "we have consented

---

[7]  While at one point the IP Company noted that it had not had the opportunity to conduct a "full audit" of the Budget (which the Bankruptcy Court flatly refused to authorize in favor of, more appropriately, "reasonable access to [the Debtors'] books and records," (IP App., Tab E, Interim Order Regarding Debtors' Cash Collateral Motion, at 3)), it did accept the cash total appearing on the Budget as of the Petition Date as "an approximate figure." (IP App., Tab F, Objection, at 8). Further, IP Company deposed Stephen P. Houle, CFO of the Management Company, before the May 28 Hearing regarding details of the Budgets. (IP App., Tab N, May 28 Hearing Transcript, at 32-33).

5

to three of the four categories they're seeking, notwithstanding the fact that we can't get adequate protection, Your Honor . . . " (IP App., Tab N, May 28 Hearing Transcript at 46). When Judge Feeney asked for confirmation of the disputed uses for cash collateral later during the same hearing, after due consideration, IP Company confirmed the narrow categories of its objection:

> THE COURT: As I understand [IP Company's] position you're disputing the -- only the management fees, the administrative expenses of the debtors and the estate's professionals, marketing expenses, that's it.
>
> MR. GARDENER [IP COMPANY'S COUNSEL]: And the administrative labor fees.
>
> THE COURT: And the administrative labor fees.
>
> MR. GARDENER: And just to make sure I haven't forgotten something, Your Honor, yes, Your Honor. I -- may I have one moment, Your Honor? (Pause) That will be it, Your Honor. Thank you.

(*Id.* at 38).

The Budget for International Place contemplates capital and operational expenses for One International Place through the Budget Period of $8,140,795 and for Two International Place of $4,781,277, for a total of $12,922,027. (IP App., Tab A, Cash Collateral Motion, at Exhibits A and B). The only amount that IP Company disputes with specificity in its brief is that designated for Estate Professional Fees, which totals $800,000, or 6.2% of the expenditures for the entire Budget Period. IP Company claims to be owed $650,830,820 in base principal and interest by the Debtors as of the Petition,

6

as well as a supposed contingent interest and acceleration premium of at least that amount again.[8] (IP App., Tab F, Opposition at 7).

### C. MAY 28 CASH COLLATERAL HEARING.

Neither party offered testimonial evidence at the May 28 Hearing. Judge Feeney noted, "[i]t seems to me that both parties agree that evidence is not necessary on the limited issues before the Court today with respect to the particular categories of expenses that are . . . requested to be approved pursuant to the budget." (IP App., Tab K, May 28 Hearing Transcript, at 48).

In addition to the $4 million net accumulation of cash collateral over the Budget Period, the Debtors reported to Judge Feeney that, since the Petition date, they had negotiated new leases and lease terms for vacant space in the International Place worth approximately $100 million to the estate over their terms. (Debtors' App., Tab 4, Cash Collateral Memo., at 2-3 and n.2). By the time of the May 28 Hearing, Judge Feeney had already authorized one the Debtors to enter into a lease with the law firm of Choate Hall & Stewart, whose lease will generate $67 million (approximately 150,000 square feet leased), and had a motion before her for authorization to do the same with respect to the law firm of Day, Berry & Howard, whose lease will generate $26.25 million (approximately 41,000 square feet leased). (*Id.*; Debtors' App., Tab 1, Docket Nos. 115, 107 in Bankr. Pet. #04-13855). The Debtors also apprised the Bankruptcy Court of a term sheet with the law firm of Litler Mendelson, whose lease is expected to generate $3.9 million (approximately 16,400 square feet leased). (Debtors' App., Tab 4, Cash

---

[8] However, Debtors dispute this "acceleration" premium sought by IP Company and have filed an adversarial proceeding seeking determination of IP Company's claim pursuant to § 506(b) of the Code.

7

Collateral Memo., at 3 n.2, 7-8). As of the Petition Date, 76.4% and 78.9% of One and Two International Place, respectively, had been leased. (*Id.* at 7). With the approval of the aforementioned leases, and certain others, the Debtors reported that approximately 90% of the space in each building would be occupied. (*Id.*).

### D. CASH COLLATERAL ORDER.

On June 3, 2004, Judge Feeney issued an Amended and Corrected Order Granting Final Approval of Use of Cash Collateral and Granting Adequate Protection (IP App., Tab J, Cash Collateral Order). Judge Feeney reiterated, "[a]t the hearing [held on May 28, 2004], all of the interested parties agreed that the use of rents/cash collateral is appropriate, and that the majority of the expenses proposed to be paid by the Debtor are proper and reasonable." (*Id.* at 2). Ultimately, she determined that IP Company was adequately protected "in the present value of the future stream of rents because, according to the Debtors' Budgets, the net rents remain steady and are increasing . . . The Debtors' Budgets demonstrate that the Debtors will have positive cash flow, and that IP's interest in rents will not be diminished during these Chapter 11 cases." (*Id.* at 3). As she found IP Company to be adequately protected for duration of the Budget, Judge Feeney declined to look behind the proposed expenses as part of this exercise ("the objection of lack of adequate protection is answered and satisfied without need to address the use to which the challenged expenditures are being put," *Id.* at 5).[9] Thus, the Debtors have been using cash pursuant to the Cash Collateral Order and the Budget since May 7, 2004.

---

[9] Further demonstrating the interlocutory nature of the relief, Judge Feeney noted that IP Company would have a later opportunity to contest the reasonableness of any fees if it chose to do so. (*Id.* at 5).

8

E. **THIS APPEAL.**

IP Company did not appeal Judge Feeney's interim order allowing Debtors to use cash collateral for the first 18 days weeks of the Budget Period. And, while it filed a Notice of Appeal from the final order that allowed use of Cash Collateral for the remaining eleven weeks, it neither sought a stay of the Cash Collateral Order from this or the Bankruptcy Court, nor did is seek to expedite its appeal. The Debtors filed, on July 13, 2004, a motion to dismiss IP Company's appeal, as the Cash Collateral Order is neither final nor appropriate for interlocutory review. The motion to dismiss is pending before this Court.

## STATEMENT OF FACTS

A. **THE PROPERTIES: THE DEBTORS HAVE OWNED ONE AND TWO INTERNATIONAL PLACE FOR WELL OVER A DECADE.**

The Debtors, FHS and FHS2, are each general partnerships that own two separate but interconnected high-rise office towers in downtown Boston (together, "International Place"). International Place comprises over 1.8 million square feet of rental space. (Debtors' App., Tab 4, Cash Collateral Memo at 6). The first building, known as One International Place, is owned by FHS1. The second, known as Two International place is owned by FHS2. (*Id.*) One International Place comprises 46 stories and was completed in 1987, whereas Two International Place has 35 stories and was completed in 1992. (*Id.* at 7). One and Two International Place are connected by a glass-enclosed courtyard with retail space and share a five-level underground parking garage with 850 parking spaces. (*Id.*) The costs of operating and maintaining International Place are allocated between the Debtors, *pro rata*, based on the square footage in each building. (*Id.* at 7).

The general partnerships comprising the ownership of International Place consist of a joint venture between one or more affiliates of the Chiofaro Company ("TCC") and the Hillman Company ("Hillman Co."). (*Id.* at 6). Historically, TCC has performed the management functions for International Place pursuant to lender-approved management agreements with the Debtors. While the promissory notes with the Debtors' lenders provide for management fees of up to 3% of gross rents plus costs, TCC has consistently charged less than this amount. (Debtors' App., Tab 3, Reply of the Chiofaro Company, Inc. and Chiofaro Building Services, Inc. to Opposition of IP Company L.L.C. to the entry of a Final Order Authorizing the Debtors to Use Cash Collateral, at 2, 5). Another affiliate of TCC, Chiofaro Building Services, Inc. ("CBS"), has historically provided building services for International Place. (Debtors' App., Tab 6, Affidavit of Theodore A. Oatis, at Exhibit F). Both TCC and CBS have always operated pursuant to annual budgets that were approved by the Debtors' lender, TIAA. (Debtors' App., Tab 5, Affidavit of Stephen P. Houle, at 2).

**B.   LENDING HISTORY FOR INTERNATIONAL PLACE.**

The First National Bank of Boston provided the initial construction financing for International Place in 1985. In 1988 TIAA provided permanent funding, which was then amended in 1993. The 1993 amendment required that each Debtor execute a separate note in favor of TIAA. The Debtors' notes are primarily secured by a single mortgage on International Place, an assignment of leases, and a security interest in funds held pursuant an escrow agreement between the parties. (Debtors' App., Tab 4, Cash Collateral Memo, at 8).

Less than six weeks before the Debtors' filing, IP Company LLC ("IP Company") acquired TIAA's position as mortgagee of International place. (*Id.* at 9). IP Company is an affiliate of Tishman Speyer, a privately held New York entity that owns, develops, and manages substantial commercial properties, including its recent acquisition of 125 High Street, an office building adjacent to and competing with International Place. (*Id.*) IP Company reportedly purchased TIAA's position for less than $600 million, a substantial discount from the face value of the debt. (*Id.*) As of the Petition Date, the aggregate debt on International Place totaled approximately $647.7 million.

## SUMMARY OF ARGUMENT

Judge Feeney found that IP Company's cash collateral, which amounted to approximately $19.7 million at the Petition Date, was adequately protected, as required by 11 U.S.C. §§361-363, over the thirteen weeks during which the Debtors sought to use it. Before the Court was substantial support for her conclusion. First, the Debtors' proffered Budget demonstrating projected administrative expenses and revenues over the Budget Period, which would comprise parameters for the Debtors' spending. The Budget, uncontested as to its accuracy, showed an accumulation of cash over the Budget Period that would result in a near $4-million increase from the Petition Date. Second, the Debtors represented that they had negotiated new leases or term sheets for vacant space in the International Place that would generate approximately $100 million in rents over their terms. Third, the Court granted IP Company "replacement liens," which it specifically requested, that would cover all postpetition rents whether from pre- or postpetition leases. IP Company declined to provide any testimonial evidence contradicting the Debtors' proffers at the May 28 Hearing, despite the Judge's prompting.

11

As Judge Feeney determined, IP Company is, without question, adequately protected against decline in the value of its Cash Collateral ($19,713,032.00) over the course of the Budget Period as mandated by §§ 361 and 363(e) (in fact, there will be millions more).

Nevertheless, brazenly contending it has veto power over the use of *any* cash collateral (as defined by the Bankruptcy Code (the "Code") 11 U.S.C. § 363(a))[10] by the Debtors in this matter, IP Company has appealed Judge Feeney's order and findings. After waiving or consenting to all other requested uses of cash collateral, IP Company limits its objection in this Court to the payment of those administrative expenses essential to the successful prosecution of the Debtors' reorganization cases, namely fees and reimbursements of expenses incurred by professionals retained by the Debtors and the Creditors' Committee (collectively, "Estate Professionals Fees"). IP Company's contention is both unfounded in the provisions of the Code and contrary to the balance of equities between debtors and creditors that supplies the foundation of debtor rehabilitation.

To convince this Court to overturn Judge Feeney's order, IP Company cobbles together a jumble of code sections and strings of case law that simply do not hang together. In the first instance, as stated above, IP Company has consented to or effectively waived all but its objection to use of cash collateral to compensate Estate Professionals, the only use that it argues with particularity in its brief. Essential to its faulty premise (that it may unilaterally veto any use of cash collateral) is that Section 552(b) of the Code demands a continuing revaluation of cash collateral to include new

---

[10] Hereafter, for brevity's sake, the Debtors will omit the reference to "11 U.S.C." and will refer only to the particular section of the Code. Further, pursuant to Fed. R. Bankr. P. 8010(b), where the determination of the issues presented in this appeal requires reference to the Bankruptcy Code, relevant parts therefrom are reproduced as an addendum hereto.

12

rents as the estate collects them over the course of the proceeding, which then must be adequately protected. However, at its heart, 552(b) is merely a perfection statute that perfects a creditor's lien in postpetition rents regardless of state law, which previously applied rendering unpredictable and inequitable results. Section 552(b) does not require, or even imply, that cash collateral collected at any time after the Petition Date must be adequately protected. This section merely preserves IP Company's lien in postpetition cash collateral such that it would have a priority to use the cash collateral in the event that the cash collateral declined below the Petition Date value or for application to its claim upon confirmation of an eventual plan.

Contrary to IP Company's position, when determining the benchmark for adequate protection of cash collateral, the Petition Date is the only practical valuation point that satisfies its constitutional purpose, while functioning in harmony with the other relevant sections of the Code. The undeniable origin of adequate protection is the constitutional prohibition of the Fifth Amendment preventing the taking of property without just compensation. Assuring a creditor that its cash collateral will not diminish over the course of a bankruptcy proceeding despite the imposition of an automatic stay (§362) accomplishes this constitutional guaranty. Thus the proper measure of the protected interest should be made at the time the "taking" would otherwise occur (by virtue of the institution of the automatic stay), namely, the Petition Date. *See In re Addison Properties Ltd. P'ship*, 185 B.R. 766 (Bankr. N.D. Ill. 1995) (court conducted extensive analysis of alternative valuation points in determining that the Petition Date is the proper point in proceeding to value cash collateral for purposes of adequate protection, despite creditors continuing lien in postpetition rents).