To further its ends, IP Company cites almost exclusively to inapposite cases discussing a fundamentally distinct issue – how net rents should be applied to a secured creditor's claim *at confirmation* pursuant to §506. Section 506 of the Code articulates the means by which a creditor's claim will be bifurcated in value between secured and unsecured interests. It specifically requires a new valuation, *inter alia,* "in conjunction with any hearing . . . on a *plan* affecting such creditor's interest." (Emphasis supplied). The cases cited by IP Company decide how net rents or other cash collateral in which a creditor has a lien will be applied pursuant to §506 at the time of confirmation, i.e., satisfying either the secured or unsecured portion of a creditor's claim (the so-called "additive" or "subtractive" cases, either adding to or subtracting from the secured portion of the claim). For this reason, IP Company's particular and heavy reliance on *Beal Bank* and other additive and subtractive cases is misplaced. This Court itself specifically recognized in *Beal Bank* that the parties did not present the point of valuation issue at all (and suggested that they do so on remand), thus implicitly acknowledging that the valuation and allocation issues are distinct. The key sections of the Code before this Court here construe adequate protection (§§361-363), not the bifurcation and allocation issues presented by §506. This distinction is especially apropos given the drastically different points of the case at which the valuations are occurring. Here, the Debtors were barely three weeks into the proceeding versus debtors at confirmation who have had ample leeway to propose a feasible plan for reorganization.

The intention of Congress that cash collateral be valued at the Petition Date for adequate protection purposes is amply supported in the legislative history of the Bankruptcy Code. *See Addison Properties,* 185 B. R. at 775 (quoting *S. Rep. No. 95-989,*

95th Cong., 2d Sess. 68 (1978) U.S. Code Cong. & Admin. News 1978, pp. 5787, 5854; *see infra*, pp 31-34. IP Company's agenda – convincing this Court that it is entitled to adequate protection of every cent of gross rents collected by the Debtors throughout the proceeding, thereby hamstringing the Debtors' efforts to reorganize – lacks support in either the Code, the case law and legislative policy.

Finally, IP Company purposely distorts the Code's treatment of Estate Professional Fees by singling out these fees in its argument. In fact, the Code considers professional fees as an administrative expense like any other postpetition cost associated with running the estate, from trash collecting to routine accounting. *See* §503(b). While professionals retained by both the Debtors and the Creditors' Committee must be authorized by the Court at multiple levels from initial employment to individual fee applications (*id.*), their fees are nonetheless an administrative expense undifferentiated by the Code for a special level of creditor scrutiny or veto. Because she found IP Company to be adequately protected for duration of the Budget Period, Judge Feeney properly declined to look behind the proposed expenses at this time, finding, "the objection of lack of adequate protection is answered and satisfied without need to address the use to which the challenged expenditures are being put." (IP App., Tab J, Cash Collateral Order at 5).[11]

---

[11]    The Original Cash Collateral Order expired on August 6, 2004. IP Company and the Debtors stipulated to the entry of an Order extending the original order through August 18, 2004, and extending the Budgets through September 10, 2004. (*See* Debtors' App., Tab 1, Docket No. 291, filed June 24, 2004, in Bankr. Pet. #04-13855).

## ARGUMENT

### A.    THE COURT LACKS SUBJECT MATTER JURISDICTION OF THIS APPEAL.

As is fully set forth in the Debtor's Motion to Dismiss Appeal and Memorandum in Support thereof, (Docket Nos. 4 & 5, filed July 13, 2004 and incorporated herein by reference), this Court lacks subject matter jurisdiction of this interlocutory appeal.[12]

It is important to clarify what is *not* before the Court in this appeal. Under the Budgets approved by Judge Feeney, all expenses are afforded equal treatment, since they are all unquestionably administrative expenses. From the outset of these cases, IP Company consented to the lion's share of the projected costs in the budget. Indeed, IP Company interposed "no objection to the use of its cash collateral for ordinary and necessary operating expenses." (IP App., Tab F, IP Objection, at 4). It similarly assented to administrative expenditures for tenant improvements in approved leases, and agreed to review any future leases "on a case-by-case basis ... subject to ... what the affect [sic] of tenant improvements will be upon the value of the Property" and committed to "review

---

[12] Even if this were an appropriate case for an interlocutory appeal, IP Company lacks standing to prosecute this appeal, having alienated its interest in the collateral. To demonstrate standing, IP Company must show, among other things, that it personally has suffered some actual or threatened injury as a result of the challenged conduct. *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982). It cannot make this showing because, by an Assignment of Mortgage dated as of April 2, 2004, IP Company "[sold], assign[ed] and transfer[ed] to UBS REAL ESTATE INVESTMENTS, INC., ... all of its rights, title, and interest in and to the mortgage and any amendments, modifications and supplements thereto." (*See* Assignment of Mortgage, dated as of April 2, 2004, and recorded in the Suffolk County Registry of Deeds at Book 34196, page 235 on April 7, 2004, attached hereto as an Addenda). (Debtors ask the Court to take judicial notice of this publicly-recorded document. *See, e.g., EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C.Cir.1997) (public records are subject to judicial notice)). Having assigned its interest in the mortgage, IP Company no longer has an interest at stake in these proceedings. UBS Real Estate Investments, Inc., not IP Company, is the only party who could claim harm arising from the Debtors' limited use of the cash collateral, if such harm existed. IP Company lacks standing, and its appeal should therefore be dismissed. UBS has not objected to the use of its Cash Collateral.

the extent of adequate protection generated from the underlying lease subject to tenant improvements."[13] *Id.*

The original Budgets provided for total expenditures of $12,922,027. In this appeal, IP Company objects to only a small portion of this sum, approximately $800,000 for Estate Professionals. This objection is particularly difficult to countenance in light of the $100,000,000 in new revenues the Debtors and professionals have secured for International Place in the first three months of these cases. More to the point, however, these fees are unquestionably an element of the cost of administering the Estates, and the Code does not permit IP Company to single out such expenditures. *Cf. Addison Properties*, 185 B.R. at 784. This appeal is clearly about nothing more than IP Company's continuing efforts to deny the Debtors of a legitimate chance at reorganization by depriving them of professional representation and advice, in direct contravention of the intent of the Bankruptcy Code.

**B.    JUDGE FEENEY CORRECTLY DETERMINED THAT IP COMPANY'S CASH COLLATERAL IS ADEQUATELY PROTECTED.**

**1.    The Debtors May Use Cash Collateral Because it is Adequately Protected.**

The Code defines cash collateral, thus distinguishing it from other forms of collateral in which a secured creditor may have an interest:

> In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels,

---

[13]    In light of its own commitment to revisit changed factual circumstances respecting adequate protection, it is hard to imagine how IP Company could claim the Cash Collateral Order is a final order.

> or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

§363(a). Section 363 of the Code also sets out the parameters for using property of the estate, with two restrictions applicable to use of cash collateral, one specific and one general. Section 363(c)(2) specifically prohibits a trustee (or, in this case, debtor in possession), from using, selling or leasing cash collateral unless;

> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

However, before a Court may authorize use of cash collateral (or indeed any collateral) per §363(c)(2)(B), it must "prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." §363(e).

The term "adequate protection" is illustrated by example, rather than defined in the Code with precision, in Section 361, and may include periodic cash payments, the grant of an additional replacement lien, or such other relief as this Court may fashion to protect the interests of an entity and the property of the Debtors. *In re Karl A. Neise, Inc.*, 16 B.R. 600, 601 (Bankr. S.D. Fla. 1981); *see also, e.g., Commonwealth of Massachusetts v. Dartmouth Nursing Home, Inc. (In re Dartmouth Nursing Home, Inc.)*, 1985 WL 17642, at *5 (D.Mass. Sept. 25, 1985) ("'Adequate protection' is a flexible concept, and its determination is left to the sound discretion of the bankruptcy court considering the facts and circumstances before it."); *Pagano v. Cooper (In re Cooper)*, 22 B.R. 718, 720 n.3 (Bankr. E.D. Penn. 1982) ("While 'adequate protection' is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and

general equitable principles. See H.R.Rep.No.95- 595, 95th Cong., 1st Sess. 339 (1977),

reprinted in 1978 U.S. Code Cong. & Ad.News 5787.").

From a policy perspective, the Code provisions concerning use of cash collateral

strive to achieve equity among the different constituencies claiming an interest in estate

property. Adequate protection is one such provision, as it seeks to balance constitutional

concerns emanating from the taking of a creditor's property (via the automatic stay) with

the Code's rehabilitative aspirations for a debtor. "Adequate protection, as derived from

the Fifth Amendment protection of property interests . . . reconciles the competing

interests of the debtor, on the one hand, who needs time to reorganize free from harassing

creditors, and the secured creditor, on the other hand, who is entitled to constitutional

protection for his bargained property interest." *First Agricultural Bank v. Jug End in the*

*Berkshires, Inc. ( In re Jug End in the Berkshires, Inc.)*, 46 B.R. 892, 898-899 (Bankr. D.

Mass. 1985) *see also In re Worldcom, Inc.,* 304 B.R. 611, 618-619 and n. 5 (Bankr.

S.D.N.Y. 2004) (quoting the legislative history of §361 stating that the concept of

adequate protection is, *inter alia,* the Fifth Amendment to the U.S. Constitution). "The

concept [of adequate protection pursuant to § 363 of the Code] indicates that a 'secured

creditor has a constitutional right to have the value of its secured claim on the petition

date preserved.'" *In re Bennett Funding Group, Inc.*, 255 B.R. 616, 643 (N.D.N.Y. 2000)

(quoting *In re Keystone Camera Prods. Corp.,* 126 B.R. 177, 183-84 (Bankr. D. N. J.

1991).

What constitutes adequate protection varies with the facts and circumstances of

each particular case; the bankruptcy court is vested with discretion to determine the form

of protection that best reflects the spirit and intent of Section 361 in these cases.

*Bramham v. Nevada First Thrift (In re Bramham)*, 38 B.R. 459, 466 (Bankr. D.

Nev.1984); *In re Lackow Brothers, Inc.*, 10 B.R. 717, 720 (Bankr. S.D. Fla. 1981); *In re*

*Family Investments, Inc.*, 8 B.R. 572 (Bankr. W.D. Ky. 1981). Regardless of its form, the

entitlement to and measure of the protection required is always determined by the extent

of the anticipated or actual decrease, if any, in the value of the secured creditor's

collateral during course of the bankruptcy case. *In re First South Savings Assoc.*, 820

F.2d 700, 710 (5th Cir.1987). Adequate protection requires only that the value of the

creditor's interest in the cash collateral be protected from diminution while the Debtors

are using the cash collateral. *United Savings Ass'n of Texas v. Timbers of Inwood Forest*

*Assoc., Ltd.*, 484 U.S. 365 (1988). Said another way, it is "intended by the Bankruptcy

Code only to assure that a secured creditor, during the pendency of a bankruptcy case,

does not suffer a loss in the value of its interest in property of the bankruptcy estate." *In*

*re Markos Gurnee P'ship*, 252 B.R. 712, 716 (Bankr. N.D. Ill. 1997).

### 2. Judge Feeney's Finding that IP Company's Cash Collateral is Adequately Protected is Well Supported by the Record.

Reciting a lengthy list of sources that she considered including numerous

pleadings, affidavits, and exhibits, as well as the argument of counsel for all interested

constituencies, Judge Feeney found in the Cash Collateral Order that IP Company was

adequately protected for the Budget Period. (IP App., Tab J, Cash Collateral Order, at 1).

Prominent among the facts provided in support of the Cash Collateral Motion was the

obvious accumulation of cash collateral from approximately $19.7 million as of the

Petition Date to $23.29 million at the close of the Budget Period (IP App., Tab A, Cash

Collateral Motions, at Exhibits A&B). In addition, Judge Feeney had already held a

hearing and authorized one of the Debtors to enter into a lease with Choate, Hall &

Stewart that would bring more than $65 million in new rents into the estate over the term of the new lease. Counsel for the Debtors further represented that it had negotiated terms for leases that would generate approximately $35 million in additional new rents—a representation that was never challenged. (Debtors' App., Tab 4, Cash Collateral Memo, at 3 n.2). Faced with overwhelming support for her determination,[14] Judge Feeney found that IP Company was adequately protected "in the present value of the future stream of rents because, according to the Debtors' Budgets, the net rents remain steady and are increasing.... The Debtors' Budgets demonstrate that the Debtors will have positive cash flow, and that IP's interest in rents will not be diminished during these Chapter 11 cases." (IP App., Tab J, Cash Collateral Order at 3). Judge Feeney's determination achieves the policy objective of maintaining the value IP Company's collateral during the pendency of the automatic stay, while allowing the Debtors responsible and accountable use of cash to aid in the equally important "fresh start" anticipated by the Code. The Bankruptcy Court's decision should be affirmed.

### 3. IP Company Misunderstands Section 552(b) as it Applies to Adequate Protection.

Disregarding the unavoidable fact that its Cash Collateral increases substantially in value over the Budget Period and the logical conclusion that IP Company is therefore adequately protected, IP Company adopts a disjointed reading of Section 552, which addresses postpetition effects of security interests. If adopted by this Court, its position would effectively deprive all debtors whose primary asset is real estate of the right to

---

[14] Significantly, Judge Feeney noted in her order that "the interested parties indicated that the issues before the Court in connection with the Motion for Use of Cash Collateral and IP's Objections could be decided on the submissions and record to date and without the necessity of live testimony or further evidence." (IP App., Tab J, Cash Collateral Order at 2). She received no evidence from IP Company that the value of the Debtors' real estate or the stream of rental income generated by the Debtors or the value of IP Company's interest in net rents would decline or diminish. (*Id.*).

reorganize, a position Judge Feeney rejected as "factually and legally flawed." (Debtors'
App., Tab 2, Motion for Order Authorizing Debtors to Enter Into Non-Residential Real
Estate Lease with Choate, Hall & Stewart, at 5-6); *see also In re National/Northway Ltd.
P'ship*, 279 B.R. 17, 29 (Bankr. D. Mass. 2002) (the 1994 amendments to the Bankruptcy
Code "clarified that Congress did not intend to deprive the single asset real estate debtor
of its right to seek bankruptcy protection.").

Section 552 of the Bankruptcy Code governs whether a security interest in any
form of collateral remains enforceable postpetition. *See* 11 U.S.C. §552. Before the
1994 Amendments, security interests in rents received different treatment than security
interests in other collateral owing to varying treatment of mortgages in different states,
largely via foreclosure statutes. *See Butner v. United States*, 440 U.S. 48, 54-55 (1979);
*see also* Kathryn R. Heidt, *The Effect of the 1994 Amendments on Commercial Secured
Lenders*, 69 AM. BANKR. L.J. 395, 399-400 (Summer 1995). The diverse treatment,
however, resulted entirely from different state rules regarding perfection of the
postpetition lien, not from any claim that the measure of protection afforded rents should
be different than that afforded other collateral. As one commentator explains:

> Under the laws of many states, a collateral assignment of rents was
> considered an "inchoate" lien, which --even if recorded -- was "perfected"
> only after the creditor took some type of action to assert dominion over the
> rents.... *The issue of rent perfection* became a subject of much litigation
> and numerous diverse rules were developed by courts, creating a situation
> in which creditors and debtors faced uncertainty as to the status of their
> respective interests. *See* 5 Lawrence P. King, et al., Collier on Bankruptcy
> ¶ 552.LH[1][a], at 552-20 (15th ed. rev. 2002).

Sally S. Neeley et al., *Postpetition Rents and the Claims of Undersecured Creditors With
Assignment of Rents in Chapter 11 Cases*, SD24 ALI-ABI 363, 373 n.10 (1998)
(hereinafter "Neely, *Postpetition Rents*") (emphasis supplied).

In order to deal with the perfection problems caused by the old version of §552(b), Congress bifurcated the section, creating § 552(b)(2). *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 (1994). The new section specifically addresses rents, parroting the language of old § 552(b) but omitting the reference to "applicable state law." *See* 11 U.S.C. §552(b)(2); Neely, *Postpetition Rents*, SD24 ALI-ABI at 373 n.10. This omission provides a secured creditor with an enforceable postpetition interest in rents, regardless of whether the creditor perfected that interest under state law, if the prepetition assignment is properly recorded. *See* 140 Cong. Rec. H 10,768 (daily ed. October 4, 1994); Neely, *Postpetition Rents*, SD24 ALI-ABI at 373 n.10; *Lyons v. Federal Sav. Bank (In re Lyons)*, 193 B.R. 637, 649 (Bankr. D. Mass. 1996) ("Section 552(b)(2) . . . provides that a mortgagee holding a valid prepetition assignment of rents may treat postpetition rents as cash collateral entitled to adequate protection"). *See also In re Barkley 3A Investors, Ltd.*, 175 B.R. 755, 758 (Bankr. D. Kan. 1994) ("[Section 552(b)(2)] will probably change the focus of future litigation of the cash collateral status of rents . . . . [W]ith the addition of § 552(b)(2), courts will not look to state law to decide whether a prepetition security interest extends to postpetition rental income").

Recognizing that the 1994 Amendment to Section 552 clarified that postpetition rents are afforded the same treatment as other collateral in which a lender has a postpetition interest,[15] IP

---

[15] Section 552(b) also empowers the court to determine that no postpetition security interest exists "based on the equities of the case." While Judge Feeney specifically declined to "make any determination *at this time* of the applicability of such exception," she certainly would be free to do so in the future, especially if IP Company continues to seek to establish a stranglehold on all assets of the Debtor with the primary intention of undermining the Debtors' rights to seek the protections of the Bankruptcy Code. *See In re Addison P'ship. Ltd. Part.*, 185 B.R. 766, 778 & n. 13 (Bankr. N.D. Ill. 1995) (noting that creditor/debtor situations like the one presented to this Court provide a creditor with "a veto on the bankruptcy case from the outset," which has struck a dissonant chord with the Appeals Court of the Fifth Circuit as a "'result which seems inconsistent with the

Company attempts to stretch this clarification well beyond its intent, claiming that because Section 552(b)(2) gives it a postpetition interest in the Debtors' rents, it must be adequately protected for every dollar in rent paid to the Debtors. (Appellant's Initial Brief at 12-13). Section 552, however, neither mentions nor adverts to adequate protection. Under Section 552, rents, "like cash proceeds of receivables or inventory, are cash collateral when included within a creditor's security interest." *In re Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997). IP Company has no right to immediate possession of the funds when its interest is adequately protected. *Id.*; *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992) ("Being subject to the automatic stay, [creditor] cannot, without leave of the bankruptcy court, enforce its security interests either in the building itself or in the rentals that the building's tenants pay").

By insisting that it is entitled to *all* rents collected postpetition, IP Company casts its net beyond the boundaries of both §552(b) and established bankruptcy case law. As numerous courts have determined, cash collateral extends only to *net* rents (which is "rental income less operating expenses," *Beal Bank*, 248 B.R. at 676). *See, In re Arden Properties, Inc.*, 248 B.R. 164, 168 (Bankr. D. Ariz. 2000) ( "'[t]he value of [the secured creditor's] secured claim for purposes of confirmation is the market value of real property plus the net amount of rents collected post-petition and pre-confirmation and subject to a deed of trust and assignment of rents,'" quoting, *Liberty Nat. Enter. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998)); *In re Prichard Plaza Assocs. Ltd. P'ship*, 84 B.R. 289, 301-302 (Bankr. D. Mass. 1988) ("[t]o the extent the debtor applies rental income to the operation and maintenance of the property (which the Debtor

---

congressional policy favoring attempts at reorganization,'" quoting, *In re Timbers of Inwood Forest Assoc. Ltd.*, 793 F.2d 1380, 1408 (5th Cir. 1986), *aff'd sub nom. United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988)).

has been doing here), the mortgagee may be considered adequately protected"). Even IP Company's authority for continuous valuation, *In re Flagler-at-First Assocs., Ltd.,* 114 B.R. 297, 298-299 (Bankr.S.D. Fla. 1990), recognizes the cash collateral at issue is limited to "monthly net operating income or excess rent."

In the analoguous circumstance of an inventory- or asset-based loan where a lender has a blanket lien on inventory, cash and receivables, it is beyond peradventure that the debtor may use the cash collateral to purchase new materials to generate new inventory (in which debtor gets a replacement lien) and subsequentially, additional accounts receivable. These new receivables generate cash, leaving the lender adequately protected, while allowing the debtor to function. *See, e.g., In re Cafeteria Operators, L.P.,* 299 B.R. 400, 410 (Bankr. N.D. Texas 2003) (where debtors sought to use cash collateral "to continue their day-to-day operation," court recognized, "if the inventory levels remain the same, the [creditor's] cash collateral is not being utilized other than to replenish [its] secured collateral"). In other words, bankruptcy law recognizes that permitting the manufacturing cycle to run does not leave a creditor without adequate protection.. The same is true of International Place – using gross rents allows a cycle of new rents to be generated, while, as demonstrated by the Budget, maintaining and even expanding Cash Collateral benefits for the Debtors and creditors alike. Refusing to recognize an obligation to maintain the estate by paying administrative expenses out of the cash collateral would lead to the absurd result that a debtor would have absolutely no opportunity to reorganize, despite a surplus of cash being generated by the estate if allowed to operate. Judge Feeney recognized and prevented this absurdity from occurring here.

As is set forth more fully *infra*, pp. 26-30, the concept of adequate protection requires only that IP Company be protected against decline in the value of the Cash Collateral as of the

Petition Date. *See Addison Properties*, 185 B.R. at 784 ("[f]or purposes of adequate protection, the claim of the secured creditor is fixed as of the date of filing"). Indeed, both in cases involving inventory proceeds subject to a postpetition lien under Section 552(b)(1) and rents subject to a postpetition lien under Section 552(b)(2), courts have recognized that the "acquisition by the estate of additional collateral post-petition does not increase the value of the claim subject to adequate protection. If the value of the original collateral has not diminished, proceeds under §552(b) may be used—pursuant to court order—to pay ordinary business expenses and administrative expenses, consistent with adequate protection." *In re Cafeteria Operators, L.P.*, 299 B.R. 400 (Bankr. N.D. Texas 2003) (restaurant inventory subject to postpetition lien), *quoting Markos Gurnee P'ship*, 252 B.R. at 717; *see also Addison Properties*, 185 B.R. at 784 (rents subject to postpetition lien). The naked fact that IP Company claims a postpetition interest in the Debtors' net rents simply does not entitle it "to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest." *In re James Wilson Assocs.*, 965 F.2d at 171.

Section 552(b) does nothing to change the fundamental premise that the Debtors needed only to demonstrate to Judge Feeney that the overall level of collateral available to IP Company remains substantially level over the Budget Period. *See In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993); *see also In re Cafeteria Operators, L.P.*, 299 B.R. at 406. Where, as here, the undisputed facts and the unchallenged Budgets demonstrate that the Cash Collateral is projected to *increase* in value during the Budget Period, IP Company is obviously adequately protected. The only effect of Section 552(b)(2) on these cases is to ensure that any perfected security interest IP Company had in the Debtors' rents prepetition remains a perfected postpetition interest that would be available to IP Company if the Cash Collateral declined in

26

value or at plan confirmation. *See, e.g., Beal Bank*, 248 B.R. at 686 (revaluing bank's secured claim at confirmation based on §552(b)(2)).

In light of the substantial return the Debtors have realized on their efforts to lease the remaining space in International Place to high-profile, long-term tenants, and the concomitant increase in the overall value of the cash collateral, the Debtors unquestionably met their burden respecting adequate protection. *See In re Cafeteria Operators, L.P.*, 299 B.R. at 409-10 (where debtor's efforts, including consumption of inventory, generated substantial revenues, replacement lien adequately protected creditors). This Court should not permit IP Company to "paralyze the debtor and gratuitously thwart the other creditors by demanding superfluous security" of Cash Collateral that is not at risk of declining in value. *In re James Wilson Assocs.*, 965 F.2d at 171.

### 4.  Valuing Secured Creditor's Claim at Petition Date Is Proper for Determining Adequate Protection.

Judge Feeney, based her finding of adequate protection, in part, on the fact that, "according to the Debtors' Budgets, the net rents remain steady and are increasing," which implicitly and correctly valued cash collateral on the Petition Date. (IP App., Tab J, Cash Collateral Order, at 3). While the Code is clear that a secured creditor's claim must be adequately protected during the pendency of the bankruptcy, the Code is silent as to when collateral must be valued to establish the measure for adequate protection. *In re Cason*, 190 B.R. 917, 924 (Bankr. N.D. Ala. 1995) ("[n]either the Bankruptcy Code nor the Bankruptcy Rules define or establish the time for determining valuation of collateral"). However, given that adequate protection theoretically is measured from the filing of the petition to assure no decline attributable to the imposition of the automatic stay, as stated above, the most logical valuation point is the Petition Date.

> Adequate protection payments are designed to compensate a holder of a secured claim for any decline in the value of its collateral post petition and preconfirmation. To prove a decline in value, the movant must complete two steps. *First, it must establish value at a beginning point, which is the benchmark.* Second, it must show a decrease in that value.

*In re Cason,* 190 B.R. at 928-929; *In re Delta Resources Inc.,* 54 F.3d 722, 729 (11th Cir. 1995) (in dicta, the Eleventh Circuit stated, "[o]rdinarily, the matter of adequate protection is determined at or near the inception of the bankruptcy case"); *In re Landing Associates, Ltd.,* 122 B.R. 288, 292 (Bankr. W.D. Tex. 1990) ("[i]t might well be appropriate to value property as of the filing date in order to evaluate whether a creditor's interest has been adequately protected. After all, the function of adequate protection is to maintain the value of the creditor's interest in the property as of the filing date"); *Markos Gurnee P'ship,* 252 B.R. at 717 ("the value of the secured creditor's interest in estate property, for purposes of adequate protection, is measured as of the filing of the bankruptcy case"); *Addison Properties,* 185 B.R. 766, 779-780 (referring to valuing collateral as of petition date as "traditional principle"); *In re Johnson,* 165 B.R. 524, 528 (S.D. Ga. 1994) ("[t]he date on which the bankruptcy petition is filed and the order of relief is entered is the watershed date of a bankruptcy proceeding. As of this date, creditors' rights are fixed (as much as possible), the bankruptcy estate is created, and the value of the debtor's exemptions is determined"); *In re Farmer,* 257 B.R. 556, 560 (Bankr. D. Montana 2000); *In re Barkley-Cupit Enterprises,* 13 B.R. 86 (Bankr. N.D. Ga. 1981).

Conversely, IP Company would have this Court adopt a so-called "continuous" valuation approach to cash collateral for purposes of determining adequate protection, which, in effect, would have IP Company control every cent collected by the Debtors.

("Adequate protection could not be granted by conferring a new lien on the rents because, as a result of §552(b)(2), the secured party already has all rents as collateral. Therefore, there can be no grant of adequate protection that can protect the secured creditor against dimunition of the value of its cash collateral. The collateral has clearly been diminished and the diminishment has clearly risen from the Debtor's use of that collateral."

Appellant's Initial Brief at 16-17). This valuation, which IP Company urges in its brief, would allow IP Company "'a veto on the bankruptcy case from the outset. This is because, without the creditor's consent, there will be no funds available for any of the administrative expenses that are required to keep the case alive.'" David F. Heroy, Adam R. Schaeffer, *Valuation in Bankruptcy*, 862 PLI/Comm. 153, 164 (Practicing Law Institute, Commercial Law and Practice Course Handbook Series) (quoting *Addison Properties,* 185 B.R. at 778). Thus, continuously valuing IP Company's cash collateral, and, more important, requiring it be adequately protected, would illogically undermine the rehabilitative policy of Chapter 11 by perversely skewing the balance of harm fatally against the debtor. It should be rejected.

> In reviewing an application under 11 U.S.C. § 363 which provides for the use of cash collateral, the Court must balance two irreconcilable and conflicting interests. The holder of a lien on cash collateral must not be left unprotected by unrestricted use of the collateral by the debtor. *However, the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business.*

*In re Dynaco Corp.,* 162 B.R. at 394 (quoting *In re Stein,* 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982)); *In re Cason,* 190 B.R. at 927 ("[t]he Bankruptcy Code as originally enacted carefully balanced creditors' property rights and the debtors' fresh start").

29

The court in *Addison Properties* was confronted with a situation almost identical to those before Judge Feeney and likewise found the secured creditors adequately protected. The debtor in that Chapter 11 case, whose major asset was seven apartment buildings, moved to fund a retainer for its counsel. 185 B.R. at 767. The lenders, however, had a security interest in rents and income generated by the real property. *Id.* at 768. Therefore, the only funds available for the retainer comprised cash collateral. The court aptly highlighted the key issue, whether the creditors were adequately protected, which would then, and only then, permit the Court to authorize the retainer. *Id.* at 769 ("[i]t is well established that cash collateral may appropriately be used to pay administrative expenses, like [Debtor's counsel's] retainer, if the interest secured by the collateral is adequately protected, but not otherwise").

Further refining its analysis, the *Addison Properties* court determined that the linchpin of an adequate protection determination is the point at which the cash collateral is valued. The case methodically discusses the effect and equities of three points of valuation. First, the court rejects a single valuation conducted at the outset of a proceeding for all purposes because it is unfairly weighted in favor of the debtor at confirmation and violates §506(a) which *requires* a valuation at confirmation. *Id.* at 771-775. It then condemns the notion of a continuous valuation, which requires a constant revaluation of cash collateral that then must be protected, because it departs from the "traditional principle" that collateral is measured at the petition date for adequate protection purposes and it unfairly treats a debtor whose asset fluctuates in value by requiring it to pay adequate protection based on the high points. *Id.* at 776-783. In the end, the *Addison Properties* court endorses a third method of valuation, requiring one

valuation at the petition date for adequate protection purposes and another at the time of plan confirmation:

> This dual valuation approach is consistent with, if not required by, Section 506(a). Its impact on the bankruptcy process is weighted in favor of neither party. Debtors are likely to have the funds necessary to meet the administrative expenses of their bankruptcy, but they cannot reduce the creditor's claim with funds accumulated through delay.

*Id.* at 784.

While *Addison Properties* has been followed in many subsequent cases by bankruptcy courts around the country,[16] IP Company attempts to dismiss the case as outcome-driven, rather than a thoughtful attempt to balance competing interests of debtors and creditors. ("At bottom, *Addison* is only explainable as a decision designed to achieve a certain result. That is, the decision provided the debtor's counsel an opportunity to obtain a $10,000 retainer in the case," Appellant's Initial Brief at 20). At the heart of IP Company's criticism of *Addison Properties* is the same misunderstanding of §552(b) that IP Company demonstrates here. Section 552(b) is a perfection statute, see *supra* at pp. 21-24; while it gives IP Company a continuing security interest in postpetition net rents, nowhere does it require that they be adequately protected. *Addison Properties,* 185 B.R. at 784 ("[f]or purposes of adequate protection, the claim of the secured creditor is fixed as of the date of filing. Section 552(b) proceeds increase the collateral securing that claim, but do not increase the claim for purposes of adequate protection").

---

[16] *E.g., In re Farmer,* 257 B.R. 556, 560 (Bankr. D. Mont. 2000); *In re Wrecclesham Grange, Inc.,* 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997); *Markos Gurnee Part.,* 252 B.R. at 717; *In re Homestead Part., Ltd.,* 200 B.R. 274, 281 (Bankr. N.D. Ga. 1996); *In re Duval Manor Assocs.,* 191 B.R. 622, 633 (Bankr. E.D. Pa. 1996).

### 5.  IP Company Relies Heavily on Confirmation Cases that Are Irrelevant to a Determination of Adequate Protection.

While IP Company asserts an entitlement to adequate protection of (and thus absolute control over) all of the income collected by the estate from the Petition Date to the filing and confirmation of a plan,[17] the cases it cites inappositely focus on the end game alone – the allocation of net rents at confirmation. However, as demonstrated above, the accepted purpose of adequate protection is to maintain the status quo *during* the proceeding while the debtor catches its financial breath, whereas at confirmation treatment of a creditor's claim is determined evermore, justifying a closer examination of the effect and equities of its security. "The reorganized debtor stands on his own two feet. The debtor in the process of reorganization, by contrast, is given many temporary protections against the normal operation of law." *Timbers,* 484 U.S. at 378.

The Code itself supports the distinction between valuation for adequate protection purposes and a later valuation for plan confirmation. Section 506 directs that a claim may be bifurcated into secured and unsecured interests. The section particularly states, "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, *and* in conjunction with any hearing on the disposition on a plan affecting such creditor's interest." § 506(a) (emphasis added); *Financial Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 798 (5th Cir. 1997) (recognizing that cases discussing

---

[17] Even if this Court determines that postpetition, net rents comprise collateral requiring adequate protection pursuant to §§ 362 and 552(b), 552(b) still allows a court to avoid postpetition lien on real estate proceeds on equitable grounds. § 552(b)(2). Judge Feeney recognized and specifically reserved this option. (IP App., Tab J, Cash Collateral Order, 3 n.2).

valuation for purposes of adequate protection were not controlling for purposes of determining interest due an oversecured creditor at plan confirmation).[18]

The legislative history of § 506 erases any doubt that the legislature anticipated separate valuations for adequate protection and confirmation. *See Addison Properties,* 185 B.R. at 775. The Senate Report on the legislation that became the Bankruptcy Code points out that such "'a valuation early in the case in a proceeding under sections 361-63 would not be binding upon the debtor or creditor at the time of confirmation of the plan.'" *Addison Properties,* 185 B.R. at 775 (quoting *S. Rep. No. 95-989,* 95th Cong., 2d Sess. 68 (1978) U.S. Code Cong. & Admin. News 1978, pp. 5787, 5854 (emphasis in *Addison Props.*). Indeed the report on the compromise legislation described the effect of Section 506 as follows: "a determination of what portion of an allowed claim is secured and what portion is unsecured is binding only for the purpose for which the determination is made." *Id.,* quoting, 124 Cong. Rec.H11095 (daily ed. Sept. 28, 1978), S17411 (daily ed. Oct. 6, 1978). In like fashion, *"determinations for purposes of adequate protection is [sic] not binding for purposes of 'cram down' on confirmation in a case under chapter 11.'" Id.,* quoting, 124 Cong. Rec.H11095 (daily ed. Sept. 28, 1978), S17411 (daily ed. Oct. 6, 1978) (emphasis in *Addison Properties*).

IP Company cites to ten cases for what it mischaracterizes as the "majority rule," that a continuous valuation is proper and that net rents must be paid to the secured

---

[18]    Another recognized distinction between the adequate protection and plan confirmation stages of a bankruptcy proceeding occurs in the usual method by which collateral is valued. The more conservative (and lesser) value obtained by applying a liquidation methodology at the adequate protection stage "since adequate protection payments immediately deplete the estate's assets -- even before it is certain that a reorganization plan will be confirmed." *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d at 74.